ELLERSLIE J. DRAPER and ANNA M. DRAPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Draper v. Commissioner
Docket No. 7518-79.
United States Tax Court
T.C. Memo 1981-228; 1981 Tax Ct. Memo LEXIS 517; 41 T.C.M. (CCH) 1450; T.C.M. (RIA) 81228; May 6, 1981. *517 Ellerslie J. Draper, pro se. Peter D. Bakutes, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1975 and 1976 in the amounts of $ 1,412 and $ 2,020, respectively, and an addition to tax under section 6651(a), I.R.C. 1954, [1] for the calendar year 1975 in the amount of $ 16. The issue for decision is whether petitioners are entitled to deductions in the amount of $ 10,000 for 1975 and $ 12,000 for 1976 as ranch losses. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Concord, California, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1975 and 1976 with the Director, Internal Revenue Service Center, Fresno, California. Ellerslie J. Draper (petitioner) is one of four children of Edna F. Draper and James E. Draper, Sr. The other three children are Edna Lee Draper Young, James *518 E. Draper, Jr., and Thomas Draper. During the early 1930's Mr. and Mrs. James E. Draper, Sr. (Mr. and Mrs. Draper), purchased several Arabian horses from the Spanish line. They had these horses transported to their ranch in California. Around 1939 Mr. and Mrs. Draper organized their activities with respect to Arabian horses into a business operation. They named their Arabian horse operation the Jedel Arabian Horse Ranch (Jedel). The Jedel operation remained at a ranch owned by Mr. and Mrs. Draper at Pinole, California, from 1939 until around 1963. In the early 1960's Mr. and Mrs. Draper experienced marital difficulties which culminated in a dissolution of their marriage in 1963. An Interlocutory Judgment of Dissolution was entered in the proceedings between Mr. and Mrs. Draper. Paragraph 4(e) of this Interlocutory Judgment provided: All Arabian horses of the parties, are by stipulation of the parties, to be transferred to the four children of the parties, to-wit: James E. Draper, Jr., Edna Lee Young, E. J. Draper and Thomas Draper as tenants in common. All of the assets and liabilities concerning and pertinent to those horses will be assumed by the said children. All gift *519 taxes that may be incurred by reason of the transfer of the horses to the children are to be assumed and paid by the children equally. Upon the ascertainment of such taxes, the children are to pay their tax. The Interlocutory Judgment was incorporated into the final decree of divorce. Mrs. Draper was the operator of the Jedel business making the day-to-day decisions. The Pinole Ranch was sold in 1963 and Mrs. Draper purchased property consisting of approximately 400 acres in Santa Rosa, California, on Llano Road (Llano Ranch) and the Jedel herd of horses was moved to that property. Subsequently, the operation was moved to Windsor, California. Pure bred Arabian horses can be registered in the Arabian Horse Club Registry of America (Registry). The Registry, which was founded in 1908, issues a Certificate of Registration for each Arabian horse registered with it which meets the Registry's qualification standards. Registration ensures the genealogy of the horse and is a prerequisite to entry of the horse in horse shows for the breed class. Registration is also necessary to establish the breeding value of the horse as a purebred and therefore protects the value of the horse. Prior *520 to the dissolution of the marriage of Mr. and Mrs. James E. Draper, Sr., Jedel horses were registered in the name of James E. Draper, Sr. After the dissolution of the marriage, registration of the horses was changed from the name of James, Sr., to the name of Jedel as funds became available. In 1963 the Drapers notified the Registry that no Jedel horse was to be accepted by the Registry for change of registration without the specific written approval of both Mr. and Mrs. Draper. Because of this requirement for change of registration of the horses, there was little market for Jedel horses for several years following 1963. In 1967 James, Sr., withdrew the requirement that he consent to changes in registration of the horses and so notified the Registry. In accordance with the agreement between Mr. and Mrs. Draper in the Interlocutory Judgment of Dissolution of their marriage in 1964, they transferred their interests in the Jedel horses to their four children, Ellerslie J. Draper, Edna Lee Draper Young, James E. Draper Jr., and Thomas Draper, as tenants in common. Sometime prior to or during the year 1965, Edna Lee Draper Young transferred her one-fourth interest in the Jedel herd *521 to her mother, Edna F. Draper. While the operation was owned by the four children and after Edna Lee Draper Young transferred her interest to her mother, Mrs. Edna F. Draper continued to manage the Jedel operation. She managed the operation from its inception through the time of the trial of this case. Mrs. Draper considered the operation to be a joint venture between herself and her three sons. Jedel reported its income, deducted its expenses, and determined its profit or loss on the cash method of accounting. From the inception of the operation, all expenses were deducted on a yearly basis and, when horses were sold, the receipts were reported as income or capital gain. Early in the operation, Jedel began selling horses on the installment basis. Since all expenses had been deducted as incurred, there was no basis in the horses when horses were sold on the installment sale basis, and the amount of the installment payments received in each year was reported as income in that year. If the horse sold was from the breeding stock and qualified as a capital asset, the amount of payment received in each year, whether the total sales price or an installment payment, was reported as *522 capital gain in the year received. After Mrs. Draper began operating the business for the joint venture, she continued this method of accounting for sales receipts for the joint venture. Mrs. Draper charged to the accounts of her three sons the normal boarding and servicing fees with respect to the Jedel horses owned by the joint venture. Each year she would determine the amount the three sons owed her, as their proportionate part of her services for care of the Jedel horses, and would credit this amount against their pro rata part of receipts from the sales of the horses. When sales receipts were insufficient to cover costs of care for the horses, she would transfer the three-quarters interest of her sons in one of the horses to herself and credit the sons' accounts as though their interest in the horse had been sold to her. If an excess of credit over the cost of caring for the horses resulted, she would show the amount as a credit to the sons' accounts on her records and carry the credit over to apply against the following year's cost of care of the horses. The following schedule was the accounting which Mrs. Draper prepared at yearend showing the credits or debits of her three *523 sons in the Jedel horses for the years ended December 31, 1965 through 1976: End of the year balances of Jim Draper, Jr., E.J. and Thomas E. Draper Horses of Jedel Arabian Horse Ranch
Dec. 31
Loss $ 13,066.00 X 3
39,198.00
1965
Total-Regular Sales
4,513.00
Total-Capital Assets
28,750.00
33,263.00
1/4 ownership--E. F. Draper
-8,316.00
24,947.00
Balance due from J.Jr.--E.J. and T.E.
Draper
14,251.00
Paid for by SUR SHARP--3/4 SUREYN BLOOD
15,000.00
749.00 CR
Apply on 1966
749.00
Dec. 31
Loss $ 12,104.00 X 3
36,312.00
1966
Total-Regular Sales
14,089.00
1/4 ownership E.F.D.
-3,522.00
10,567.00
Balance due from J.Jr.--E.J. and T.E.D.
25,745.00
Paid for by Sur Royyal--50% RASEYN
25,000.00
745.00
Cover by credit from 1965
749.00
4.00 CR
Apply on 1968
4.00
Dec. 31
Loss $ 7,977.00 X 3
23,931.00
1967
Total Sales Regular
11,710.00
Total Sales Cap. Assets
11,500.00
23,210.00
1/4 ownership E.F.D.
5,802.00
17,408.00
Balance due from J.Jr.--E.J. and T.E.D.
6,523.00
Paid for by Grand Duke--Potential Race Sire
7,500.00
977.00 CR
Apply on 1968
977.00
Dec. 31
Loss $ 10,068.00 X 3
30,204.00
1968
Total Regular Sales
5,552.00
Total Cap. Assets Sales
8,100.00
13,652.00
1/4 ownership E.F.D.
-3,413.00
10,239.00
Balance due from J.Jr.--E.J. and T.E.D.
19,965.00 DR
Paid for by credit from 1967
-977.00
18,988.00 DR
Paid for by credit from 1966
-4.00
18,984.00 DR
Paid on account by transfer Caravia (mare)
4,000.00
14,984.00 DR
*524 s End of year balances of Jim Jr. -- E.J. -- T. E. Draper Jedel Arabian Horse Ranch Horse
Dec. 31
Loss of $ 12,202.00 X 3
36,606.00
1969
Total Regular
7,685.00
Total Cap. Assets
55,010.00
62,695.00
1/4 -- E.F.D.
-15,674.00
47,021.00
10,415.00
Credit Balance
Carry forward from 1968
-14,984.00
DR
4,569.00
DR
Carry forward to 1970
4,569.00
Dec. 31
Loss of $ 9,200.00 X 3
27,600.00
1970
Total Sales Reg.
20,650.00
Total Cap. Assets
31,710.00
52,360.00
1/4 E.F.D.
-13,090.00
39,270.00
11,670.00
Credit Balance
Carry forward from 1969
-4,569.00
DR
7,101.00
CR
Carry forward to 1971
7,101.00
Dec. 31
Loss of $ 6,126.00 X 3
18,378.00
1971
Total Sales Reg.
10,658.00
1/4 -- E.F.D.
-2,665.00
-7,993.00
10,385.00
DR
Carry forward from 1970
-7,101.00
CR
3,284.00
DR
Carry forward to 1972
3,284.00
Dec. 31
Loss of $ 7,033.00 X 3
21,099.00
1972
Total Sales Reg.
30,082.00
1/4 E.F.D.
-7,521.00
22,561.00
1,462.00
Credit Balance
Carry forward from 1971
-3,284.00
DR
1,822.00
DR
Carry forward to 1973
1,822.00
DR
End of year balances of J.D. Jr. -- E.J. -- T. E. Draper Horses of Jedel Arabian Horse Ranch Dec. 31
Loss of $ 7,776.00 X 3
23,328.00
1973
Total Sales Reg.
32,558.00
1/4 -- E.F.D.
-8,139.00
24,419.00
1,091.00
CR Balance
Carry forward from 1972
1,822.00
DR
731.00
DR
Carry forward to 1974
731.00
Dec. 31
Loss of $ 13,105.00 X 3
39,315.00
1974
Total Sales Reg.
16,851.00
Total Cap. Assets
13,825.00
30,676.00
1/4 -- E.F.D.
-7,669.00
23,007.00
16,308.00
DR
Carry forward from 1973
731.00
DR
17,039.00
DR
Paid for by transfer of Neer To Me to E.F.D.
75,000.00
CR - 50% RASEYN
57,961.00
CR
Carry forward to 1975
57,961.00
CR
Dec. 31
Loss $ 12,336.00 X 3
37,008.00
1975
Total Sales Reg.
28,675.00
Total Cap. Assets
3,675.00
32,350.00
1/4 -- E.F.D.
-8,088.00
-24,262.00
12,746.00
DR
Carry forward from 1974
57,961.00
CR
45,215.00
CR
Carry forward to 1976
45,215.00
CR
Dec. 31
Loss $ 13,417.00 X 3
40,251.00
1976
Total Sales Reg.
19,215.00
Total Cap. Assets
12,750.00
31,965.00
1/4 E.F.D.
-7,991.00
-23,974.00
16,277.00
DR
Carry forward from 1975
45,215.00
CR
28,938.00
CR
Carry forward to 1977
28,938.00
CR
*525 At the end of each year Mrs. Draper would furnish each of her sons with a statement of her charges for services and the receipts from the sale of horses. However, she did not treat as sales the three-fourths interest in horses transferred to her by her sons when the receipts from the Jedel operation had not been sufficient to offset the cost of caring for the horses. The horses "Sur Sharp," "Sur Royyal," "Grand Duke," and "Caravia" were in the Jedel herd when the herd was given to the four Draper children in 1964. The horse "Neer To Me" was a foal produced by the Jedel operation after the transfer of the horses to the children. The $ 75,000 which Mrs. Draper credited on her records as being the value of the interest of her sons in "Neer To Me" when the horses was transferred to her, represented three-fourths of the amount Mrs. Draper considered to be the fair market value of the horse. Petitioner, beginning in 1964 and continuing each year thereafter through the years here in issue, claimed ranch losses on his Federal income tax returns. The amounts he claimed as losses were approximately the amounts of his one-fourth of the costs of caring for the Jedel horses, which amounts were *526 captioned "loss" on his other's schedule entitled "End of the year balances of Jim Draper, Jr.--E.J. and Thomas E. Draper." In each of the years here in issue petitioner had not received the final statement from his mother at the time of filing his tax return. On line 32, "Farm income or (loss) (attach Schedule F)," of his 1975 return which he signed under date of May 13, 1976, petitioner showed "Loss Estimated" of $ 10,000. Petitioner reduced the income reported on his return by this claimed $ 10,000 loss in arriving at his taxable income for 1975. On the Schedule F attached to this return appeared petitioner's name and address and the name of the business as "Jedel Arabian Horse Ranch." No figures appeared on the return in the place where sales should have been shown. Across the face of the Schedule F was written the statement "Estimated 1/4 Share undivided interest (Farm) of expenses & capital gains loss see attached Letter." On line 54 of the Schedule F entitled "Net farm profit or (loss)" appeared the words "Estimated Loss" and the amount of $ 10,000. Insofar as here pertinent, the attached letter stated: SCHEDULE F- Back in the 1960's, my parents were divorced and in the *527 court settlement, the Arabian horses of the Jedel Arabian Horse Ranch were given to the children. The children chose my mother to manage the horses for us and she is still doing so. However, she is getting up in age and has far too much work to do to be able to keep up the bookwork on time to file every year. So I turn in an estimate every year of what she thinks my share of the expenses will be, and I am doing it again this year. I have consulted with tax attorneys and they have approved this procedure as acceptable. On his Federal income tax return for the calendar year 1976, petitioner claimed a loss of $ 12,000 from the Jedel operation. To this return was attached a Schedule F substantially in the same form as the one attached to petitioner's 1975 return with the estimated loss shown as $ 12,000.Across this Schedule F from was written the following: Note: The final figures for the profits or losses of the Jedel Arabian Horse (for 1976 & 1975) Ranch have not been completed as yet. I will send in an adjusted return as soon as I receive them as I have done in the past. My estimated share of the losses is indicated below. The $ 12,000 figure was indicated to be petitioner's *528 one-fourth share of the loss from the ranch operation. Respondent in his notice of deficiency disallowed the claimed farm losses of $ 10,000 and $ 12,000 for the calendar years 1975 and 1976, respectively, with the following explanation: (a) It is determined that losses claimed of $ 10,000.00 in 1975 and $ 12,000.00 in 1976 from the operation of the Jedel Arabian Horse Ranch are not allowable because it has not been established that any losses wer incurred or that any amounts were expended for the purpose designated in a transaction entered into for profit. Accordingly, your 1975 and 1976 taxable incomes are increased by $ 10,000 and $ 12,000, respectively. OPINION The issues here are purely factual. Counsel for respondent at the trial stated that respondent no longer contended that the Jedel operation was not a farming operation carried on with the intent to make a profit. Respondent, however, continued to contend that there had been no effective gift of the horses on the Jedel Ranch to the children of Mr. and Mrs. James E. Draper, Sr., and further contended that petitioner had no basis in the horses on the Jedel Ranch. There was much testimony concerning whether a gift of the *529 Jedel horses was made by Mr. and Mrs. James E. Draper, Sr., to their four children. Mrs. Edna F. Draper, petitioner's mother, who was a witness in the case, produced a copy of a gift tax return which she testified had been sent to the Internal Revenue Service and also a record of a check stub indicating that a check had been drawn to the order of the Internal Revenue Service in payment of gift tax. Respondent introduced testimony to show that there was no record in the files of the office of the District Director of Internal Revenue in San Francisco that such a gift tax return had been filed or that any gift tax had been paid. We do not consider it necessary to determine whether in fact the gift tax return which was prepared by Mrs. Draper was ever filed. Mrs. Draper testified that a gift of the horses was made to the four Draper children in 1963 or 1964. Furthermore, the record shows that since 1964 she had accounted to her children as tenants in common for sales and expenses of the ranch. Clearly Mr. James E. Draper, Sr., has not, at least since 1967, had any connection with the Jedel horses or any ownership interest in them. Without going into the detail of the evidence respecting *530 the gift of the Jedel horses to the Draper children, suffice it to say that from the evidence we conclude that Mr. and Mrs. James E. Draper, Sr., did give the Arabian horses in the Jedel operation to their four children in 1964 and that the three sons have owned a one-fourth interest each in the operation since that time. Mrs. Draper's daughter at sometime prior to the end of 1965 transferred her interest in the horses to Mrs. Draper. The record is clear that the method of accounting used by Mr. and Mrs. James E. Draper, Sr., prior to the time the horses were given to their children, resulted in their having no basis in the horses at the time they gave them to their children. Section 1015 provides that if property is acquired by gift after December 31, 1920, its basis in the hands of the donee shall be the same as it would be in the hands of the donor except that if such basis is greater than the fair market value of the property at the time of the gift, for the purpose of determining loss the basis in the hands of the donee shall be such fair market value. Obviously since Mr. and Mrs. James E. Draper, Sr. had no basis in the horses at the time they were given to their children, *531 the fair market value of the horses was greater than the donor's basis and therefore the children assumed their parents' zero basis in the horses given to them. Likewise, since all costs were deducted on a yearly basis, Mrs. Draper and her three sons had no basis in the horses produced in the Jedel operation after 1963. In fact, Mrs. Draper recognized this to be the fact by the method she used to report the income of the operation. She included total receipts from sales of horses either as income or capital gain and currently deducted expenses of the ranch operation. Clearly petitioner's system of deducting the costs of the operation as a loss in each year is incorrect. In each of the years from 1965 through 1976, there were sales of horses resulting in income to the joint venture, one-fourth of which was petitioner's income. Petitioner should have deducted the costs of the operation from the income each year to determine the gain or loss. The loss of $ 10,000 claimed by petitioner in 1975 and $ 12,000 in 1976 is not a loss but his share of the expense of the operation. The records kept by Mrs. Draper show that petitioner's one-fourth share of the regular sales of horses in *532 1975 was $ 7,169 and his one-fourth share of the capital gain sales was $ 919 of which at least one-half would be taxable. Therefore petitioner had at least $ 7,628 of income from the operation in 1975 to offset any of the expenses allocable to him. In 1976 petitioner's one-fourth share of the sales of horses resulting in ordinary income was $ 4,084 and his one-fourth share of the amounts set forth on Mrs. Draper's records as capital gain was $ 3,187 of which at least one-half or $ 1,594 would be taxable. Therefore, in 1976 petitioner had at least $ 5,678 of income to offset against his pro rata part of the expenses of the operation. The real problem in this case is how the transfer of petitioner's interest in a horse to his mother in payment of a part of the expenses of caring for the Jedel horses should be handled. Since we do not have before us any years except 1975 and 1976, we will start with the transfer by petitioner of his one-fourth interest in "Neer To Me" to his mother in 1974. The evidence shows that petitioner's mother credited petitioner with $ 25,000 on the basis of this transfer. Therefore, the problem arises whether this $ 25,000 should be considered income to *533 petitioner in 1974 or, because of the method used by petitioner's mother in accounting for the value of the interest of each of her children in the horses transferred to her, should be considered as an installment sale by petitioner to his mother of his one-fourth interest in "Neer To Me." If considered as an installment sale, each installment payment would be the portion of petitioner's one-fourth of the cost of caring for the Jedel horses in each of the years 1974, 1975, and 1976 which was charged against the $ 25,000. [2] *534 *535 Certainly, when petitioner transferred his interest in a horse to his mother with the understanding that the value of his interest in the horse would be used to pay the fee he owed to her for care of his horses, a sale occurred resulting in income to petitioner at some time. Since many, if not all, of the Jedel horse sales were on the installment basis and the operation only reported as income the installment payments received, to be consistent, petitioner's transfer of his one-fourth interest in "Neer to Me" to his mother in 1974 should be considered an installment sale of his interest in this horse. The installment payments were received when portions of the $ 25,000 were credited on petitioner's mother's records to his pro rata share of the cost of the maintenance of the Jedel horses. Using this system of accounting for petitioner's income from the transfer of "Neer To Me" to his mother, it is obvious that petitioner's income from and costs of the Jedel operation were equal in each of the years 1975 and 1976. [3] *536 Therefore, petitioner had no loss from his interest in the Jedel Arabian horse operation. We therefore sustain respondent's disallowance of petitioner's claimed loss deduction of $ 10,000 in 1975 and $ 12,000 in 1976 from the Jedel operation. The record is clear that petitioner's 1975 return was not timely filed. Petitioner has not placed in issue respondent's determination of an addition to tax for the year 1975 under section 6651(a) of $ 16. In any event, petitioner has failed to show any reasonable cause for failure to timely file his 1975 return and therefore the addition to tax under section 6651(a) was proper. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years here in issue.↩
2. The evidence does not show whether the horse "Neer To Me" was a part of the Jedel breeding herd so that it might have been considered a capital asset when it was sold. Section 1231(b)(3) provides, insofar as here pertinent, as follows: (b) Definition of Property Used in the Trade or Business.--For purposes of this section-- (1) General rule.--The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not-- (3) Livestock.--Such term includes-- (A) cattle and horses, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 24 months or more from the date of acquisition, and (B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition. If petitioners had introduced evidence to show the purpose for which "Neer To Me" was held and how long the horse had been held by the Jedel operation, they might have shown that a sale of this horse was a sale of a capital asset. However, the burden of proof is on petitioners and no evidence was introduced with respect to the status of "Neer To Me" at the time petitioner's interest in the horse was transferred to his mother. We must therefore assume that a sale of "Neer To Me" at that time would have resulted in ordinary income to petitioner.
3. We have not overlooked the fact that had evidence as to the exact amount of the expenses of the Jedel operation and the nature of the sales shown as sales of capital assets been introduced, petitioner might have shown a deductible loss from the Jedel operation in the amount of the capital gain deduction credited against costs of caring for the horses. However, this record is insufficient to establish any such loss. Petitioner has not shown the composition of the items shown as "loss" of $ 12,336 in 1975 and $ 13,417 in 1976. He has not shown that the amount entitled "Cap. assets" in each of these years were sales of horses which were capital assets within the provisions of section 1231(b) (3). The amounts designated "loss" in each year on Mrs. Draper's schedule exceeded the "loss" claimed by petitioner.